UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TRAVIS HARDWICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:15-cv-01161-JMS-DML |
| | ) | |
| INDIANA BELL TELEPHONE COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Travis Hardwick, who is male, worked for Defendant Indiana Bell Telephone Company ("Indiana Bell") for over five years. During his tenure, Mr. Hardwick worked as a premises technician, installing and repairing residential telephone, internet, and television services for Indiana Bell customers. After Indiana Bell terminated Mr. Hardwick's employment, he brought this lawsuit alleging sex discrimination based on a single comment, and retaliation under Title VII of the Civil Rights Act of 1964. Indiana Bell moved for summary judgment, [Filing No. 66], and that motion is now ripe for the Court's review. In addition, Indiana Bell filed a Motion for Leave to Respond to Mr. Hardwick's Surreply, [Filing No. 90], and the parties objected to several pieces of evidence, each of which the Court will also consider herein.

## I.
### MOTION FOR LEAVE TO RESPOND TO SURREPLY

On July 13, 2018, Indiana Bell filed a Motion for Leave to Respond to Mr. Hardwick's Surreply. [Filing No. 90.] In support of its Motion, Indiana Bell states that "[i]n the interests of fairness and equity, Indiana Bell should be allowed to briefly state why Plaintiff's Surreply exceeds

the scope of Local Rule 56-1(d) and why Plaintiff's motion to strike must be denied." [Filing No. 90 at 1.]

Local Rule 56-1(d) allows a party opposing summary judgment to file a surreply "only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." However, neither the local rules nor the Federal Rules of Civil Procedure address when a movant should be allowed to file a response to a surreply. In denying such motions, some courts have summarily found "that further briefing is unnecessary," *Thomas v. S. Bend Cmty. Sch. Corp. Bd. of Trustees*, 2007 WL 2572395, at *1 (N.D. Ind. Aug. 31, 2007), while other courts have found that granting motions to respond to a surreply results in "full briefing" that is "fair and useful to the adjudication of the case," *Makhlouf v. Tailored Brands, Inc.*, 2017 WL 1092311, at *8 (S.D. Tex. Mar. 23, 2017); *see also Hammett v. Am. Bankers Ins. Co.*, 203 F.R.D. 690, 695 (S.D. Fla. 2001) (granting a plaintiff's motion for leave to respond to a surreply because the plaintiff had introduced a new legal theory in her reply brief).

Indiana Bell seeks to respond to Mr. Hardwick's surreply for two reasons. First, Indiana Bell points out that in his surreply, Mr. Hardwick objects to the admissibility of the Declaration of Grace Biehl. [Filing No. 89 at 3-4.] The Court finds that under the rationale set forth in Local Rule 56-1(d), Indiana Bell should be permitted to respond to Mr. Hardwick's arguments regarding the admissibility of this evidence, and therefore the Court grants Indiana Bell's Motion for Leave to Respond to Mr. Hardwick's Surreply to the extent that Indiana Bell is responding to admissibility arguments in Mr. Hardwick's surreply.

In addition, Indiana Bell seeks to respond to Mr. Hardwick's Surreply in order to point out that it exceeds the scope of Local Rule 56-1(d). [Filing No. 90 at 1.] Rather than file a Motion to Strike, which is disfavored during the summary judgment process by Local Rule 56-1(i), Indiana

Bell seeks to include its argument in favor of striking portions of Mr. Hardwick's surreply within a response. Given that this Court regularly entertains arguments regarding the scope permitted by Local Rule 56-1(d), *see, e.g. Chaib v. GEO Grp., Inc.*, 92 F. Supp. 3d 829, 835 (S.D. Ind. 2015), *aff'd*, 819 F.3d 337 (7th Cir. 2016), the Court grants Indiana Bell's Motion for Leave to Respond to Mr. Hardwick's Surreply to the extent that Indiana Bell raises arguments regarding the permissible scope of Mr. Hardwick's surreply.

Accordingly, the Court **GRANTS** Indiana Bell's Motion for Leave to Respond to Mr. Hardwick's Surreply, [Filing No. 90], and will consider Indiana Bell's response, [Filing No. 90-1], as appropriate herein.

## II.
### EVIDENTIARY OBJECTIONS

The parties' briefs contain three evidentiary objections, each of which the Court will consider in turn.

### A. Motion to Strike Paragraph 6 of Mr. Hardwick's Affidavit

Indiana Bell moves to strike paragraph 6 of Mr. Hardwick's affidavit, contending that it is a "post-deposition affidavit which contradicts his deposition testimony." [Filing No. 84 at 5.] Indiana Bell argues that in his deposition, Mr. Hardwick stated that he asked garage manager Charlie Smith if he remembered the situation with area manager Lisa Brantley. [Filing No. 84 at 5.] Subsequently, in his affidavit, Indiana Bell states that Mr. Hardwick "now claims he affirmatively stated he believed the 'nice ass' comment constituted 'sexual harassment.'" [Filing No. 84 at 6.] Indiana Bell contends that the affidavit "is entirely new testimony which [Mr.] Hardwick should have provided during his deposition, if true." [Filing No. 84 at 6.]

In response, Mr. Hardwick contends that his deposition testimony "is not in conflict with his affidavit testimony." [Filing No. 89 at 2.] Mr. Hardwick contends that he "was not asked to

remember and recite each and every statement that he made to Mr. Smith in his deposition," and that his "affidavit testimony discusses in further depth what was said during this meeting with Mr. Smith." [Filing No. 89 at 2.]

In *Dunn v. Menard, Inc.*, the Seventh Circuit set forth the following rule for when deposition testimony and a subsequent affidavit are in conflict:

> As a general rule . . . this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony. Thus, where deposition testimony and an affidavit conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.

880 F.3d 899, 910-11 (7th Cir. 2018) (internal quotations and citations omitted). Helpful to this analysis is a prior Seventh Circuit case that distinguished conflicting statements given by two separate individuals from those originating from the same individual. *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996). There, the Court set forth the same rule as *Dunn*, but stated that it is to be applied "with great caution" and in instances "when a witness has contradicted directly his or her own earlier statements without explaining adequately the contradiction or without attempting to resolve the disparity." *Id.* at 1168-69.

Applied to the facts of this case, the Court finds that Mr. Hardwick's affidavit, stating "I told Mr. Smith that I considered the 'Nice ass' statement to be sexual harassment," [Filing No. 80-2 at 1], is not in direct conflict with his prior deposition testimony regarding Mr. Smith where Mr. Hardwick stated, "I asked him to come out in the garage so I could talk to him. I just asked him if he could remember the situation, because that's when I was considering calling the EEOC," [Filing No. 67-1 at 35]. Mr. Hardwick was not specifically asked the content of this conversation, nor was he asked any follow-up questions regarding the conversation. Moreover, Mr. Hardwick's

affidavit testimony that he felt the comment was sexual harassment is consistent with his consideration of calling the EEOC and is consistent with Mr. Smith's reply that "if it went where he had to go in front of a court or give testimony, then he would tell the truth." [Filing No. 67-1 at 35.] To be sure, Mr. Hardwick's affidavit contains information that was not disclosed during the deposition, but it does not contain a statement that is in direct conflict with his deposition testimony. Accordingly, Indiana Bell's Motion to Strike paragraph 6 of Mr. Hardwick's affidavit is **DENIED**.

### B. Motion to Strike the Declaration of Grace Biehl

Mr. Hardwick moves to strike the Declaration of Grace Biehl, arguing that it is hearsay because Ms. Biehl lacks personal knowledge to support her testimony and instead relies upon company documents that were not attached to her Declaration. [Filing No. 89 at 3-4.]

In response, Indiana Bell contends that Ms. Biehl's Declaration contains "matters within her personal knowledge – steps *she* took to investigate [Mr. Hardwick's] responses to the charges against him and the authentication of notes *she* took during the Union-Management Review Board hearing." [Filing No. 90-1 at 3 (emphasis in original).] Indiana Bell further contends that the Declaration is an admissible exception to the hearsay rule under Federal Rule of Evidence 803(3). [Filing No. 90-1 at 3-4.]

The Federal Rules of Evidence provide that "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . ." is not excluded by the rule against hearsay. Fed. R. Evid. 803(3).

In this case, Ms. Biehl's Declaration consists of two pages that Indiana Bell attached in support of its reply brief. [Filing No. 82-4 at 2-3.] Indiana Bell cited Ms. Biehl's Declaration only once throughout its briefing, and did so to support its argument that the "evidence does nothing to call into question the honesty of the Company's belief that [Mr.] Hardwick's conduct violated Company rules. Biehl's notations on [Mr.] Hardwick's submissions demonstrate the Company investigated [Mr.] Hardwick's explanations and found them to be discredited by other information in the Company's possession." [Filing No. 84 at 9-10.] Accordingly, the Court finds that the statements set forth in Ms. Biehl's Declaration were offered by Indiana Bell to show Ms. Biehl's state of mind and not for the truth of the matter asserted. As such, Ms. Biehl's Declaration is not hearsay and Mr. Hardwick's Motion to Strike Ms. Biehl's Declaration, [Filing No. 89 at 3-4], is **DENIED**.

### C. Motion to Strike Portions of Mr. Hardwick's Surreply

Indiana Bell moves to strike paragraphs 8 through 14 of Mr. Hardwick's surreply, contending that the arguments contained therein exceed the scope of Local Rule 56-1(d) by reiterating and expanding upon substantive arguments regarding the merits of Mr. Hardwick's retaliation claim. [Filing No. 90-1 at 1.] Indiana Bell argues that the local rules "do not allow [Mr. Hardwick] the final word on these substantive arguments." [Filing No. 90-1 at 2.]

Turning to paragraphs 8 through 14 of Mr. Hardwick's surreply, the Court observes that Mr. Hardwick is not responding to new arguments in Indiana Bell's reply brief. Mr. Hardwick essentially argues that even though there is no "direct evidence that Ms. Brantley was aware that he had engaged in protected activity," [Filing No. 89 at 2], she had circumstantial knowledge of the same. That this argument could have been made in Mr. Hardwick's response brief is demonstrated by Mr. Hardwick's contention that Indiana Bell incorrectly interpreted *Luckie v.*

*Ameritech Corp.*, 389 F.3d 708 (7th Cir. 2004), [Filing No. 89 at 2], because this case was cited by Indiana Bell in its brief in support of summary judgment concerning Indiana Bell and Ms. Brantly's knowledge of Mr. Hardwick's complaints (or lack thereof). [Filing No. 69 at 21.]

"Although the Court always tries to allow litigants a full and fair opportunity to respond to arguments made by their adversary, including allowing surreplies, surreplies are not allowed under the local rules unless they are to address newly raised evidence or arguments, or respond to objections raised in the reply." *Chaib*, 92 F. Supp. 3d at 835. Here, Mr. Hardwick used his Surreply not to respond to new arguments or evidentiary objections, but to make arguments that he could have made in his response brief. As such, Indiana Bell's motion to strike Paragraphs 8 through 14 of Mr. Hardwick's Surreply, [Filing No. 90-1], is **GRANTED** and Paragraphs 8 through 14 of Mr. Hardwick's Surreply, [Filing No. 89], are **STRICKEN**.

### III.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's

fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

# IV.
## STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed in Part I.[1]

The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. Mr. Hardwick's Chain of Command at Indiana Bell

Mr. Hardwick began working for Indiana Bell as a premises technician in June 2008. [Filing No. 67-1 at 9.] His job duties involved installing "U-Verse products for AT&T." [Filing No. 67-1 at 10.] In the course of his duties, which Mr. Hardwick primarily performed alone, he accepted new job assignments by touching a "Dispatch" button on his iPad, at which point he

---

[1] The Court notes that the Seventh Circuit has repeatedly held that a "district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions," *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015) (citing *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009)). Local Rule 56-1(e) requires a party to "support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence. . . . The citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." However, both parties flouted this rule at various points throughout their briefing.

In his Memorandum in Opposition to Summary Judgment, [Filing No. 80], for example, Mr. Hardwick merely cited to Indiana Bell's brief in support of several alleged facts. Though it did a much more serviceable job with its citations, Indiana Bell set forth a handful of statements in its "Statement of Material Facts Not in Dispute" section where the pages cited in the record do not support the fact set forth by Indiana Bell. For example, Indiana Bell cites to Mr. Hardwick's deposition in support of its contention that "Hardwick installed and repaired customers' telephone, internet, and television services at their residences. (Filing No. 67-1, at ECF 10). He worked independently in the field, and traveled to job assignments in a Company-owned vehicle equipped with a GPS monitoring device (called 'VTS,' or vehicle tracking system). (Filing No. 67-1, at ECF 10-11)." [Filing No. 69 at 3.] However, Mr. Hardwick does not mention VTS in his deposition and only indirectly alludes to cable and telephone installation. As such, the Court omits these statements from its Statement of Facts.

would be given information about his first job. [Filing No. 67-1 at 10-13.] Similarly, Mr. Hardwick would close out completed jobs and receive his next job of the day by touching the "Close" button on the iPad. [Filing No. 67-1 at 13.] At the end of his shift, Mr. Hardwick would go home after receiving a text message from his immediate manager permitting him to do so. [Filing No. 67-1 at 23.]

Mr. Hardwick initially reported to Indiana Bell's garage at Girls School Road in Indianapolis, Indiana, but in October 2013, he transferred to Indiana Bell's Martinsville garage. [Filing No. 67-1 at 25; Filing No. 67-1 at 45.] Mr. Hardwick reported to a garage manager who, in turn, reported to an area manager. [Filing No. 67-1 at 29.] The area manager was responsible for managing and overseeing all aspects of the garages, including the performance of the premises technicians. [Filing No. 67-4 at 3.] At some point, Lisa Brantley became the area manager who supervised Mr. Hardwick. [Filing No. 67-1 at 30.] Mr. Hardwick was supervised at various points by the following garage mangers: Christopher Cook, Charlie Smith, Barry Voorhees, and Norm Toothman. [Filing No. 67-1 at 25; Filing No. 80-1 at 9.] In addition, Grace Biehl was the Lead Labor Relations Manager responsible for advising managers of union-represented employees on disciplinary actions. [Filing No. 67-5 at 2.]

While he was assigned to the Girls School Road garage, Mr. Hardwick applied for and became a "home dispatch technician," meaning he was able to hit the "dispatch" button from his house, rather than from the garage. [Filing No. 67-1 at 26.] However, on January 22, 2013, Barry Voorhees removed Mr. Hardwick from home dispatch due to his "November 2012 and December 2012 performance metrics." [Filing No. 67-1 at 103.] Mr. Hardwick was asked if he wanted to be reinstated to the program on April 19, 2013, and he refused. [Filing No. 67-1 at 104.] Mr. Hardwick re-entered the program sometime in the summer of 2013. [Filing No. 67-1 at 49.]

**B. The Collective Bargaining Agreement, Code of Business Conduct, and Guidelines governing Mr. Hardwick's Employment**

Mr. Hardwick was a member of a labor union – the Communications Workers of America – and held the position of union steward. [Filing No. 67-1 at 13-14.] As a union employee, the terms and conditions of Mr. Hardwick's employment were covered by a collective bargaining agreement, of which he received a copy. [Filing No. 67-1 at 13.] "[F]or the most part," Mr. Hardwick understood the grievance process. [Filing No. 67-1 at 14-15.]

Mr. Hardwick received a copy of Indiana Bell's Code of Business Conduct, ("COBC"), and received annual training on the COBC. [Filing No. 67-1 at 14-15.] The COBC provided that:

> All employees, at every level and across every area of our business, should understand the Code and be personally committed to it. So, I'm asking you to do three simple things:
>
> - Review the Code carefully; know what it means and what is expected of you.
> - Follow the Code in everything you do.
> - Do not hesitate to file a report if you see or suspect that an employee or contractor is acting in an unlawful or unethical manner. It's your responsibility, and you can be assured that your company will not tolerate retaliation against any person who reports an unlawful or unethical act.

[Filing No. 67-1 at 77.] The COBC further provided a hotline number that could be used if reporting a violation of the COBC to a supervisor was "uncomfortable." [Filing No. 67-1 at 86.] Mr. Hardwick refused to sign an acknowledgement attesting that he read the COBC, [Filing No. 67-1 at 88], because he was not an attorney and did not "completely understand it," but understood that his refusal to sign the COBC did not exempt him from the requirement to read it, [Filing No. 67-1 at 18].

Mr. Hardwick also received a copy of the guidelines for premises technicians (the "Guidelines"). [Filing No. 67-1 at 18-20.] The Guidelines provided as follows:

1.3.    Technicians are expected to be in route to their first job within a reasonable amount of time, set by their supervisor, not to generally exceed 15 minutes after the start time. Technicians should proceed directly from their last job to their work location and generally not return to the garage earlier than 15 minutes before the scheduled conclusion of their shift.

1.4.    If an employee does not have work and returns to the garage more than 15 minutes before the end of the work day, the employee must contact the supervisor for further instructions.

[Filing No. 67-1 at 91.]

3.1.    Each employee is responsible for accurate and factual time reporting as covered in the Code of Business Conduct. All time spent in work activities must be reported so that employees are paid for all time worked.

[Filing No. 67-1 at 92.]

Premises Technician Guidelines

6.10.   Technicians should eliminate all unnecessary idling, including idling for personal comfort, to reduce idling time in all aspects of our operations. Although the regulations currently in effect have specific allowances for vehicle idling, the Company has adopted a requirement eliminating vehicle idling, except as provided below:

    6.10.1.1.    Idling necessary to operate defrosters, heaters, air conditioners, or other equipment to prevent a safety or health emergency is permissible, but not solely for the comfort of the driver. All Technicians working in the heat should be familiar with the ways to identify and prevent heat illness per EH&S Job Aid EHS-3500-JBA-1. Similarly, technicians working in the cold should be familiar with the information in EH&S Fact Sheet EHS-3500-FST. Additional information on AT&T's Idling Practice can be found in the source document: EHS-2200-PRC .

    6.10.2.    Conditions that would compromise operator and passenger safety.

    6.10.3.    Idling in traffic.

    6.10.4.    Main engine is necessary to run auxiliary/power take-off equipment.

    6.10.5.    Vehicle is being serviced.

[Filing No. 67-1 at 95.]

10.2.   Technicians must always gain approval from a supervisor before assisting another technician on a job.  The name of the approving supervisor and the technician that is being helped must be recorded on the timesheet and/or in GCAS.

[Filing No. 67-1 at 96.]

### C.  Mr. Hardwick's 2013 Interaction with Ms. Brantley[2]

At some point in 2013, Mr. Hardwick was wearing denim, khaki colored pants, rather than the slacks the company required him to wear.  [Filing No. 67-1 at 33.]  When Mr. Hardwick and Charlie Smith were alone with Ms. Brantley, "she turned and looked and said, 'Hey, where's your company-issued pants?'"  [Filing No. 67-1 at 33.]  Thereafter, Mr. Hardwick and Ms. Brantley got into a disagreement regarding whether his pants were jeans.  [Filing No. 67-1 at 33-34.]  He then turned and showed her the tag on the right rear pocket, at which point Brantley remarked, "Nice ass."  [Filing No. 67-1 at 34.]  Ms. Brantley then said, "Did I really say that out loud?"  [Filing No. 67-1 at 34.]  Mr. Smith does not recall this incident and does not recall being involved in any conversation with Mr. Hardwick and Ms. Brantley regarding whether Mr. Hardwick was wearing the proper pants.  [Filing No. 82-3 at 3.]

Weeks later, Mr. Hardwick met with Mr. Smith to ask him "if he could remember the situation," because Mr. Hardwick was "considering calling the EEOC."  [Filing No. 67-1 at 35.]

---

[2] Prior to this allegation, sometime in 2011, Mr. Hardwick alleged that Ms. Brantley held a meeting where she acknowledged having been arrested.  [Filing No. 67-1 at 68.]  Mr. Hardwick alleged that  "without going into great detail she said, yes, she got picked up, her attorney was supposed to take care of it.  And when she got arrested, that it was embarrassing, they did do a strip search. She had to spread her butt cheeks and spread her vagina," [Filing No. 67-1 at 38].  However, Mr. Hardwick subsequently admitted that this occurred outside of the statute of limitations.  [*See* Filing No. 80 at 24 ("Indiana Bell claims that Mr. Hardwick did not timely file his EEOC Charge on June 6, 2014 in order to claim sexual harassment. . . . Indiana Bell is correct with regard to the strip search story told by Ms. Brantley").]  Accordingly, the Court surmises that Mr. Hardwick has abandoned this claim and therefore, the Court will not detail allegations related to the "strip search" story.

Mr. Hardwick told Mr. Smith that he "considered the 'Nice ass' statement to be sexual harassment." [Filing No. 80-2 at 1.] Mr. Smith said that he did remember it and would tell the truth in court, but would not admit to the truth in the office. [Filing No. 67-1 at 35.] Mr. Smith does not recall this incident. [Filing No. 82-3 at 4.]

Following the incident with Ms. Brantley, Mr. Hardwick did not call HR or call the ethics line or attempt to contact Ms. Brantley's supervisor. [Filing No. 67-1 at 36.]

### D. Mr. Hardwick's Employment throughout Fall 2013

On September 13, 2013, Mr. Voorhees issued a written warning and 1-day suspension to Mr. Hardwick for failing to adhere to the Guidelines and failing to follow a management directive the previous month. [Filing No. 67-1 at 106.] Following a union grievance, Indiana Bell made the following finding:

The Company finds no contractual violations regarding this step of progressive discipline. In full, fair, and final settlement of this grievance the Company agrees to rescind the 1 DS however the Written Warning will remain in place. Any further violations of PTG will result in progressive discipline up to and including termination. Input made today in ELINK to change 9/13/13 from suspension day to paid day.

[Filing No. 67-1 at 108.] Ms. Brantley was not involved in the suspension, other than making the decision to overturn it. [Filing No. 67-1 at 53.]

On September 19, 2013, Mr. Voorhees met with Mr. Hardwick at the Girls School Road garage regarding Mr. Hardwick coming to the garage every morning each week. [Filing No. 67-1 at 105.] Mr. Hardwick responded that he had to get supplies. [Filing No. 67-1 at 105.]

In October 2013, Mr. Hardwick transferred to Indiana Bell's garage in Martinsville, Indiana. [Filing No. 67-1 at 45.] Mr. Hardwick did not transfer to Martinsville at the same time as the other technicians because Ms. Brantley delayed his transfer. [Filing No. 67-1 at 45.] Mr. Hardwick's transfer was delayed a week or two. [Filing No. 67-1 at 47.] Immediately prior to the his transfer, Mr. Hardwick met with Ms. Brantley, who made a comment about "yanking" Mr.

Hardwick's "ass back to the Girls School Garage" if he stirred the pot following the transfer. [Filing No. 67-1 at 36.] Following the meeting, Mr. Hardwick called Larry Robbins and Bryan Halterman "to notify them just of the comments that she had made." [Filing No. 80-1 at 6.]

Due to the preferences of the manager, everybody at the Martinsville garage "would work through lunch just so they could go home at 4:00." [Filing No. 67-1 at 61-62.]

### E. Audits of the Martinsville Garage

In late October or early November 2013, Indiana Bell performed an audit of the Martinsville garage. [Filing No. 67-2 at 7-8.] In early December 2013, Indiana Bell conducted a second audit of the Martinsville garage (the "December Audit"). [Filing No. 67-2 at 23.]

Following the December Audit, Ms. Brantley put together notes of her interpretation of the December Audit results as they related to Mr. Hardwick. [Filing No. 67-2 at 29.] In order to prepare her notes, Ms. Brantley looked at Mr. Hardwick's work log, GPS records, VTS records, and timesheets. [Filing No. 67-2 at 30.] Ms. Brantley's notes for various days throughout the December Audit ("Audit Notes") are as follows:

- Monday, December 2, 2013

> Supposed to be at customer prem by 0800, goes to garage first arriving at 0814, so he was 14 minutes late if he started at the garage. Arrived at the first customer at 0837 and closed his last ticket at 1554 for a total of about 7.5 hours of work. Returns home by 1630 which is ½ an hour prior to his shift ending and charged .5 hours OT

[Filing No. 67-2 at 35.]

- Tuesday, December 3, 2013

> Supposed to be at customer prem by 0800, goes to garage first arriving at 0757. Leaves the garage after an hour and idles for 18 minutes at the customer prem. Spent 20 minutes at Sunset which should be too far to be the cross box, but maybe it is. Idles again for 46 more minutes then goes to the CO for 15 minutes and returns home by 1615, 45 minutes prior to the end of his shift. Start work at 0800 if he was

supposed to go to the garage, arrived at first customer at 0926 appears to be complete at 1458 when he idles his truck prior to going to the CO. Closed his ticket at 1552 meaning that he either had about 6 or 7 hours of work completed, dependent on which time you use, and arrived home 45 minutes prior to the end of his shift.

[Filing No. 67-2 at 35-36.]

- Wednesday, December 4, 2013

Supposed to be at customer prem by 0800, goes to 729 SR 39 Bypass arriving at 0814. This would make him late for work again if there is something at this location that relates to his first customer, if not, he did not get to the customer's prem until 0827 making him almost 30 minutes late for work. He again has idle time which should result in an OP78 violation unless he was sitting in his truck at the first location and if that is the case, he shouldn't have been idling. He spends 13 minutes at Foxcliff and 124 minutes at Kanterbury Lane for a total of 2 hours and 17 minutes of wasted time, although he charged us for 1 hour of OT.

[Filing No. 67-2 at 36.]

- Thursday, December 5, 2013

Supposed to be at customer prem by 0800, goes to 7301 E SR252 first arriving at 0827 making him late for work again as long as this had something to do with his first customer. There is about 45 minutes missing from closing the first ticket and arriving at the second customer prem and 67 minutes idle time for a total of 112 minutes of non-productive time – 1 hour 52 minutes. One hour could have been his lunch, but he also charged us 2 hours of OT. He closed his ticket at 1729, so if he started work at 0827 and was finished at 1729, we have 9 hours total time. 1 hour 52 minutes unaccounted for puts us at about 7 hours of work, yet he charged us the 2 hours OT. Supposing he was actually doing work during that 1 hour 52 minutes, and he worked through his lunch, then he would be entitled to the 2 hours OT.

[Filing No. 67-2 at 37.]

- Friday, December 6, 2013

Supposed to be at customer prem by 0800, goes to garage first arriving at 0806, again tardy for work. Spent an hour at the garage then went to Grassyfork Lane arriving at 0925. Did some maneuvering around so he wouldn't have to work too much as he was taking a ½ day off.

[Filing No. 67-2 at 37.]

- Monday, December 9, 2013

    Supposed to be at customer prem by 0800, but doesn't arrive at Hadley Road until 0821, 21 minutes tardy for work. Starts work at 0821 closed his last ticket at 1512 for a total of about 7 hours of work. Of course we have a lot of idle time which should not be productive time as the truck was running unless he was out of the truck, then OP78 violation. He charged 1 hour of OT.

[Filing No. 67-2 at 38.]

- Tuesday, December 10, 2013

    Supposed to be at customer prem by 0800, goes to 277 W Morgan St first arriving at 0810, tardy for work. 4 hours + for an internet only order. Over an hour between first job closed and second job dispatched. Starts work at 0810 and leaves last prem at 1607 for a total of 8 hour, yet charged 3 hours OT.

[Filing No. 67-2 at 38.]

- Wednesday, December 11, 2013

    Supposed to be at customer prem by 0800, goes to Colt Dr first arriving at 0820, so he is tardy again if this has something to do with the first customer. Starts at 0820 and leaves last customer at 1755 after 15 minutes of idle time for a total of 9 hours and 35 minutes and charged 2.5 hours of OT. He also spent 45 minutes at the garage, so if he had a valid reason to be there and if he worked through lunch, then this might actually be an accurate portrayal of his day.

[Filing No. 67-2 at 39.]

- Friday, December 13, 2013

    Supposed to be at customer prem by 0800 and looks like he might have actually been there or at the cross box by 0801. He's done by 1431 and idles there for about 35 minutes and then goes to the garage arriving at 1535 and leaves at 1643. That means about 6.5 hours of actual work time, an hour for lunch and two 15 minute breaks next to each other and you get 8 hours, yet he charges 1.5 hours of OT, unless he had a valid reason to be at the garage.

[Filing No. 67-2 at 39.]

- Saturday, December 14, 2013

    Supposed to be at customer prem at 0800 but doesn't leave home until 0805 and arrives at the customer prem at 0845, 45 minutes late for work. Starts at 0825 and starts truck at last customer at 1625 closing the ticket at 1651 for a total of 8 hours 16 minutes, with .75 hours OT charged but he had a lot of idling time. Maybe he worked through part of his lunch and this would be an accurate amount of time charged.

[Filing No. 67-2 at 40.]

- Monday, December 16, 2013

  Supposed to be at customer prem at 0800 arrives at Martinsville garage at 0803, so only 3 minutes tardy if he was supposed to start at the garage. He arrives at his first customer at 1053 and left his last customer at 1657. There is no possible way for him to charge you for 2.5 hours MXUP and 1.5 hours of OT no matter how you look at this. He was done at his last customer by 1657 and should have had no reason to idle for 50 minutes or waited half an hour to close his ticket. Even if you took the close time and not the leaving from the prem, you are only at 1730, half an hour over. There are two times he

  could have been taking his lunch with the 2 long idling times, but no way would he be entitled to 1 hour of the 1.5 hours OT he claimed.

  [Filing No. 67-2 at 40-41.]

- Tuesday, December 17, 2013

  Supposed to be at the customer by 0800 but arrives on Main Street at 0816, so he is late for work again if this location had anything to do with his first customer. He closed his last ticket at 1808, so if the time at the garage is lunch, then he might have this day's time correct. Still lots of idling time though.

  [Filing No. 67-2 at 41.]

- Wednesday, December 18, 2013

  Supposed to be at the customer prem by 0800, arrives at the Martinsville Garage at 0805, late for work again. Started at 0805 and closed his last ticket at 1540 for a total of 7 hours and 35 minutes.

  [Filing No. 67-2 at 42.]

### F. Indiana Bell's Actions Following the December Audit

On December 26, 2013, Ms. Brantley sent an email to Ms. Biehl along with Mr. Hardwick's work log. [Filing No. 67-2 at 43.] Ms. Biehl replied that if the VTS backed up the information on the work log, then "we have COBC and Prem Tech Guidelines violations." [Filing No. 67-2 at 43.] In response to Ms. Biehl asking her what she would like to do with Mr. Hardwick, Ms. Brantly wrote:

> I'd like to terminate for multiple COBC violations. Can you support that? VTS does support everything I sent you. Actually VTS is how I found the issue. He is not the only offender but is the biggest offender. I met with all techs in Martinsville in November advising that I was aware of them not doing the right things. I gave each of them to opportunity to self-correct and Jamie Ginter backed me up on this conversation. The techs are attempting to take advantage of a new manager and I want to send a strong message.

[Filing No. 67-2 at 43.]

On January 10, 2014, Ms. Brantley held a meeting with Mr. Hardwick where she "provided paperwork [for] a few days with GPS readings." [Filing No. 80-1 at 9-11.] At the meeting, Mr. Hardwick was suspended pending his eventual termination. [Filing No. 67-1 at 56.]

On February 4, 2014, Indiana Bell held a Union-Management Review Board in which Mr. Hardwick was represented by his labor union and Ms. Brantley and Ms. Biehl were present. [Filing No. 67-1 at 56-57; Filing No. 67-5 at 3.] At the meeting, Mr. Hardwick presented facts that he contended excused the findings of the December Audit. [Filing No. 67-1 at 56-57; Filing No. 67-5 at 3.] During the meeting, Mr. Hardwick submitted a document containing his explanations as to why his conduct did not violate Indiana Bell's employment policies, [Filing No. 82-4 at 2], however, he failed to provide an excuse that Ms. Brantley or Ms. Biehl considered valid, [Filing No. 67-5 at 3]. He did not apologize or express any commitment to change his behavior. [Filing No. 67-4 at 6.]

### G. Mr. Hardwick's Explanation of the December Audit and Indiana Bell's Subsequent Investigation

Mr. Hardwick makes the following contentions regarding the December Audit:[3]

- On Monday, December 2, 2013, Mr. Hardwick "went to the Girls School Road garage for equipment." [Filing No. 80-2 at 2.]

- On Tuesday, December 3, 2013, Mr. Hardwick "went to the Martinsville garage to pick up equipment" prior to going to his first job, closed his ticket at the Central Office where he "was emptying trash with [his] manager's approval," and then his manager sent him "on non-ticket job" and he was told not to close his "previous ticket until the non-ticket job was finished which also explains the overtime claimed." [Filing No. 80-2 at 3.]

---

[3] Here the Court makes several observations about the evidentiary record put forth by Mr. Hardwick. First, Mr. Hardwick took contemporaneous notes on his activities on the days at issue in the Audit Notes. [*See* Filing No. Filing No. 80-2 at 8 (Mr. Hardwick's handwritten notes); Filing No. 80-2 at 17-22 (additional handwritten notes).] Although Mr. Hardwick attached his handwritten notes to his affidavit, [Filing No. 80-2 at 8; Filing No. 80-2 at 17-22], Mr. Hardwick's notes are at points illegible, and at other points unintelligible. Mr. Hardwick's notes appear to be a chronology of his activities throughout the December Audit period, but rather than contain any information that refutes the allegations recorded by Ms. Brantley in her notes, Mr. Hardwick's notes merely list addresses and approximate times of his work at various residences throughout the day. As such, the Court declines to attempt to summarize Mr. Hardwick's contemporaneous notes on his activities between December 2 and December 18, 2013.

In addition, based upon his contemporaneous notes, Mr. Hardwick recorded several notations on the side of Ms. Brantley's Audit Notes. [Filing No. 80-2 at 9-16; *see also* Filing No. 80 at 7 n.2 (stating that Filing No. 80-2 at 9-16 contains "Mr. Hardwick's notes as to Ms. Brantley's allegations").] In his deposition, Mr. Hardwick merely states that these are his notes that he made explaining each section. [Filing No. 67-1 at 70.] However, Mr. Hardwick does not state when or for what purpose his notes were recorded, nor does he indicate whether such notes were provided to Indiana Bell. The content of many of Mr. Hardwick's notations are repeated in his affidavit, which is admissible in summary judgment proceedings. *See Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997). Accordingly, rather than cite to Mr. Hardwick's notations themselves, the Court will cite instead to Mr. Hardwick's attestations in his affidavit.

As a final matter, the Court notes that in numerous instances, Mr. Hardwick's affidavit veers from presenting a first-hand account to presenting a third person narrative in which Mr. Hardwick repeatedly refers to himself as "Mr. Hardwick." The Court is aware that "[a]ffidavits, though signed under oath by the affiant, are typically . . . written by the affiant's lawyer." *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623 (7th Cir. 2002). However, counsel for Mr. Hardwick is reminded that the rules for summary judgment require an affidavit to "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

- On Wednesday, December 4, 2013, Mr. Hardwick's manager permitted him to go back to a customer's residence "to fix an issue." [Filing No. 80-2 at 2.]

- On Thursday, December 5, 2013, Mr. Hardwick had to "jump" his vehicle before leaving his home in the morning, informed his manager via text message that he might be tardy, drove through four inches of snow to pick up his trainee at the garage, and then left his truck idling most of the morning to recharge its battery. [Filing No. 80-2 at 4.] He then "went to the customer's crossbox first to perform testing to diagnose the issue," which "is equivalent to the residence of a customer since the issue for a customer can be at either location." [Filing No. 80-2 at 2.] In addition, due to the freezing rain, Mr. Hardwick turned his truck on for ten minutes at a time to keep the truck warm due to freezing rain," and commuted home from Bloomington, Indiana. [Filing No. 80-2 at 3.] He then went to the garage to empty his trash and meet with his manager. [Filing No. 80-2 at 4.]

- On Friday, December 6, 2013, Mr. Hardwick worked half a day accompanied by a trainee, who he dropped off with another technician at the Sunset Mobile Home Park. [Filing No. 80-2 at 2.]

- On Monday, December 9, 2013, Mr. Hardwick was across the street from a job putting gas into his vehicle in one instance, and in another instance dropped off equipment to another technician with his manager's approval. [Filing No. 80-2 at 2.]

- On Tuesday, December 10, 2013, Mr. Hardwick went to a customer's crossbox first to perform testing to diagnose the issue. [Filing No. 80-2 at 4.] In addition, he idled and had overtime because he had to wait for someone else to fix something. [Filing No. 80-2 at 4.] His manager then asked him to help another technician and not to close his ticket until this work was completed. [Filing No. 80-2 at 4.] Furthermore, Mr. Hardwick's manager asked him to assist a customer without a job ticket. [Filing No. 80-2 at 2.]

- On Wednesday, December 11, 2013, Mr. Hardwick was dispatched to his first customer's house at 7:50 a.m. [Filing No. 80-2 at 5.] He went to the restroom before closing the ticket at his second job of the day, and did not close the ticket on the third job of the day because he had no cellular connection. [Filing No. 80-2 at 4.] His manager asked him to come to the garage to discuss a "chronic ticket." [Filing No. 80-2 at 5.] At some point that day, he was at the gas station getting gas for his vehicle. [Filing No. 80-2 at 3.] Further, at some point that day, he closed down a lane of traffic while working on a pole, and at other points, was on the phone with his manager.[4] [Filing No. 80-2 at 5.]

---

[4] Mr. Hardwick's affidavit, particularly the page concerning December, 11, 2013 is, at times, incomprehensible and contradictory. For example, he states that "I spent some of his idle time on the phone with my manager . . . ." Then, speaking in the third person about himself, he states "Mr. Hardwick closed this job after disposing of garage at the garage." [Filing No. 80-2 at 5.] The Court cannot make heads or tails of such attestations. In addition, Mr. Hardwick states at one point that he "needed to pick up a modem at the Martinsville garage before starting [his] jobs on that date," [Filing No. 80-2 at 5,] but elsewhere states that he "went to the customer's crossbox first to perform testing to diagnose the issue," [Filing No. 80-2 at 3]. "Internally contradictory affidavits

- On Wednesday, December 18, 2013, Mr. Hardwick went to the restroom and called his manager. [Filing No. 80-2 at 3.]

Ms. Biehl subsequently investigated the explanations Mr. Hardwick put forth at the Union-Management Review Board, and noted the following instances where information in Indiana Bell's possession contradicted Mr. Hardwick's explanation:

- 12/2/13 -- "call recs don't support" Hardwick's claim he was on the phone with his manager;

- 12/3/13 – Hardwick did not obtain manager approval to work through lunch;

- 12/4/13 – Hardwick last spoke to his manager at 3:07 p.m., but represented in his submission that at 3:39 p.m. he was ok'd by his manager to go back to a customer home;

- 12/9/13 – no call record to support Hardwick's claim he talked to his manager at 4:50 p.m.;

- 12/10/13 – no call record to support Hardwick's claim he had manager approval to help a technician with an install at 5:11 p.m.;

- 12/13/13 – no call record to support statement he went back to the garage because his manager wanted detail about a job; and

- 12/14/13 – no call record to support statement he called his manager at 10:09 a.m.

[Filing No. 82-4 at 2-3.]

---

are generally disfavored." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 n.5 (7th Cir. 2004) (citations omitted). However, as set forth subsequently herein, Mr. Hardwick's affidavit does not create a genuine issue of material fact in any event.

A similar Union-Management Review Board had been held in August 2013 for another premises technician – Mike Petersen – who was suspended for lesser violations than those uncovered in the December Audit of Mr. Hardwick's behavior. [Filing No. 67-4 at 6-7.] Mr. Petersen accepted full responsibility for his actions and demonstrated a willingness to correct his behavior; as such, Indiana Bell offered him a "back-to-work agreement" rather than terminating his employment. [Filing No. 67-4 at 6-7.]

### H. The Lawsuit

Mr. Hardwick initiated this lawsuit on July 24, 2015, and filed the operative Amended Complaint on February 7, 2017. [Filing No. 1; Filing No. 41.] Indiana Bell has moved for summary judgment, [Filing No. 66], and that Motion is now ripe for the Court's decision.

### V.
### DISCUSSION

At the outset, the Court notes that there are a number of disputed facts in this case. As set forth in Part III, however, a disputed fact is material only if it might affect the outcome of the suit under the governing law. *Hampton*, 561 F.3d at 713 (7th Cir. 2009). In this case, the facts in dispute are not outcome determinative, and the Court considers the record in the light most favorable to Mr. Hardwick, consistent with the summary judgment standard.

As another preliminary matter, the Court must determine what claim or claims Mr. Hardwick has brought. In the operative Complaint, Mr. Hardwick brought a single count that alleges discrimination, hostile work environment, and retaliation, each arising under Title VII. [Filing No. 41 at 4.] The same day, Mr. Hardwick filed a statement of claims consistent with Court order, [Filing No. 59 at 1], in which he "makes the following statement regarding the claims to be proven at trial in this matter, and states as follows: 1. Count I – sexual harassment actionable under Title VII. 2. Count I – hostile work environment pursuant to Title VII. 3. Count I –

retaliation actionable under Title VII." [Filing No. 62.] Notably missing from this list is any claim that Mr. Hardwick's gender caused a discharge or other adverse employment action. It is unclear from Mr. Hardwick's Complaint whether he had originally intended to bring such a claim, but to the extent that he did, Mr. Hardwick's failure to include an employment discrimination claim in his Statement of Claims operates as an abandonment of that claim. *See Schambers v. Key Family of Companies*, 2018 WL 1794915, at *7 (S.D. Ind. Apr. 16, 2018).[5]

Remaining are Mr. Hardwick's claims that he was sexually harassed by being subjected to a hostile work environment,[6] and that Indiana Bell retaliated against him for complaining about sexual harassment. Indiana Bell argues that it is entitled to Summary Judgment on both of Mr. Hardwick's claims. The Court discusses each claim, in turn.

---

[5] It follows that Mr. Hardwick's subsequent reliance on *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which sets forth the legal standard for employment-discrimination cases, is misplaced. The Court notes that Mr. Hardwick's mention of *Ortiz* in his response brief is somewhat fleeting – after discussing *Ortiz* for two paragraphs, Mr. Hardwick never revisits this argument. Nonetheless, *Ortiz* has no bearing upon Mr. Hardwick's claim for hostile work environment or for retaliation, and the Court will not further analyze this portion of Mr. Hardwick's response brief.

[6] Mr. Hardwick uses the terms imprecisely, and at times appears to articulate his claim for sexual harassment based on a hostile work environment as two separate claims – one for sexual harassment and another for hostile work environment. However, sexual harassment based on a hostile work environment is, in fact, one claim. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 24 (1993) (Scalia, J., concurring) ("Title VII prohibits sexual harassment that takes the form of a hostile work environment"). As such, the Court will refer to this claim herein as Mr. Hardwick's hostile work environment claim.

Title VII recognizes another type of sexual harassment claim – quid pro quo harassment, which "occurs in situations where submission to sexual demands is made a condition of tangible employment benefits." *Bryson v. Chicago State Univ.*, 96 F.3d 912, 915 (7th Cir. 1996). Indiana Bell contends that Mr. Hardwick cannot prove sexual harassment under a quid pro quo theory, and Mr. Hardwick did not set forth any argument in opposition. [Filing No. 69 at 14; Filing No. 80.] As such, Indiana Bell contends that any quid pro quo claim has been waived. [Filing No. 84 at 1 n.1.] The Court does not discern that Mr. Hardwick brought a quid pro quo claim but, in any case, the Court agrees with Indiana Bell that Mr. Hardwick has, indeed, waived any such claim, and that the evidence before the Court does not support such a claim in any event.

### A. Hostile Work Environment Claim

"Title VII of the Civil Rights Act of 1964 prohibits an employer from engaging in . . . . harassment that creates a hostile or offensive working environment." *White v. The Money Store*, 142 F.3d 441 (7th Cir. 1998) (quoting *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993)). In support of its argument that it is entitled to summary judgment on Mr. Hardwick's hostile work environment claim, Indiana Bell makes two arguments.

#### 1. Timeliness of Mr. Hardwick's Hostile Work Environment Claim

Indiana Bell first argues that it is entitled to summary judgment on Mr. Hardwick's hostile work environment claim because it is untimely. [Filing No. 69 at 14-15.] Indiana Bell contends Mr. Hardwick alleges that Ms. Brantley said "nice ass" to him in June 2013 – more than 300 days prior to June 6, 2014, when Mr. Hardwick filed his EEOC charge. [Filing No. 69 at 14-15.] In support of its contention that Mr. Hardwick alleges that the comment in question occurred in June 2013, Indiana Bell cites to Mr. Hardwick's deposition. [Filing No. 69 at 16-17 (citing Filing No. 67-1 at 34).]

Mr. Hardwick maintains that his claim is timely, as the incident occurred in August or September 2013. [Filing No. 80 at 24.] In support of this contention, Mr. Hardwick points to portions of his deposition indicating that the comment took place a few weeks prior to October 2013. [Filing No. 80 at 24 (citing Filing No. 80-1 at 3-7).]

In its reply brief, Indiana Bell reiterates its timeliness argument, but points to a different page of Mr. Hardwick's deposition. [Filing No. 84 at 2 (citing Filing No. 82-1 at 4).]

In his surreply, Mr. Hardwick states that "[w]ith the benefit of the discovery taken in this matter, I believe that Ms. Brantley made the 'nice ass' comment at the earliest around the end of

August 2013 or the first half of September 2013 at the latest." [Filing No. 89 at 1 (citing Filing No. 89-1).]

"A person claiming to be aggrieved by a violation of Title VII of the Civil Rights Act of 1964 may not maintain a suit for redress in federal district court until he has first unsuccessfully pursued certain avenues of potential administrative relief." *Love v. Pullman Co.*, 404 U.S. 522, 523 (1972). In Indiana, a, EEOC charge "must be filed within 300 days of the occurrence of the act that is the basis of the complaint." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994) (citing 42 U.S.C. § 2000e–5(e)(1)). "Failure to timely file an administrative charge is an affirmative defense, and the burden of proof at summary judgment therefore rests on the defendant." *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009) (citing *EEOC v. Watkins Motor Lines, Inc.*, 553 F.3d 593, 596 (7th Cir. 2009); *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 921-22 (7th Cir. 2007)).

There are numerous problems with the evidence put forth by both parties on this point, but as the burden rests with Indiana Bell, the Court will focus its analysis on Indiana Bell's evidence. The excerpts of Mr. Hardwick's deposition that Indiana Bell initially provided to the Court in support of its Motion for Summary Judgment do not contain any statement by Mr. Hardwick that the comment occurred in June 2013. [*See generally* Filing No. 67-1.] In its reply brief, Indiana Bell introduced a new page of Mr. Hardwick's deposition in which Mr. Hardwick was asked whether "May of 2013" was "about the timeframe" of Ms. Brantley's comment, to which Mr. Hardwick replied "Yeah, I'm – that exactly – May that's what I told the attorney that was representing – I thought it was May or June at that time. She just told me to put May down." [Filing No. 84 at 2 (citing Filing No. 82-1 at 4).] Given that Mr. Hardwick had the opportunity to respond to this argument in his surreply, the Court will consider this evidence, despite the fact that Indiana

Bell presented it for the first time in its reply brief. *See Lyon Fin. Servs., Inc. v. Jude's Med. Ctr., Ltd.*, 2011 WL 6029195, at *3 (N.D. Ill. Dec. 5, 2011) (noting that evidence presented for the first time in a reply brief is disfavored). Even so, the statement made by Mr. Hardwick in his deposition is sufficiently imprecise that Court is not persuaded that Mr. Hardwick was testifying with certainty that the incident occurred in June 2013. To the contrary, it appears that Mr. Hardwick merely testified that he thought the incident occurred in May or June when he initially filled out the charge of discrimination in 2015, and that his lawyer instructed him to note the charge of discrimination accordingly. As such, the Court will not dismiss Mr. Hardwick's claim as untimely.

### 2. Merits of Mr. Hardwick's Hostile Work Environment Claim

In addition, Indiana Bell argues that Mr. Hardwick "did not experience a work environment that was hostile because of his male gender." [Filing No. 69 at 16.] Specifically, Indiana Bell argues that the alleged comment was "not so severe or pervasive that [it] altered [Mr.] Hardwick's working conditions or created an abusive environment," as evidenced by Mr. Hardwick's admission that the comment did not prevent him from working, change his job requirements, or hinder his performance in any way. [Filing No. 69 at 16 (citing Filing No. 67-1 at 37-40).] In addition, Indiana Bell contends that "the Seventh Circuit and district courts in the Circuit have dismissed on summary judgment claims with arguably more offensive comments than those alleged here." [Filing No. 69 at 16-17.]

In his response brief, Mr. Hardwick contends that "[t]here is no question" that Ms. Brantley subjected him to "unwanted verbal conduct of a sexual nature by making her 'Nice ass' statement," that "Ms. Brantley directed this comment at Mr. Hardwick because he was male," and that "Indiana Bell is vicariously liable for her sexual harassment as a matter of law" due to Ms. Brantley's position as an area manager and second-level supervisor. [Filing No. 80 at 24-25.] Additionally, invoking the "#MeToo environment," Mr. Hardwick states that:

hopefully, what should be tolerated and what creates a hostile work environment for any and all employees is changing for the better and Title VII is providing more protection than ever before. Isn't one degrading and humiliating act of any supervisor abusing their power enough in this day and age[?]

[Filing No. 80 at 25.]

In its reply brief, Indiana Bell states that "the legal standard for evaluation of sexual harassment claims does not support [Mr. Hardwick's] contention and the standard has not changed." [Filing No. 84 at 2.] Indiana Bell reiterates its argument that "a plaintiff asserting a sexual harassment claim must prove the harassment was so severe or pervasive it created a hostile working environment," and contends that the comment at issue in this case "cannot establish a subjectively or objectively hostile or abusive working environment." [Filing No. 84 at 2-3.] Instead, Indiana Bell argues that Ms. Brantley's alleged comment "is an example of the 'occasional vulgar banter, tinged with sexual innuendo' which is not legally actionable." [Filing No. 84 at 5.]

Mr. Hardwick does not address this argument in his surreply. [Filing No. 89.]

"To succeed on a claim for hostile environment, a plaintiff must demonstrate that: (1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for em- ployer liability." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018), *reh'g denied* (July 24, 2018). With regard to the third element – that the conduct alleged must be "sufficiently severe or pervasive to alter the conditions of employment" – this determination is made based "on the se- verity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (citations omitted). The Seventh Circuit has recently explained that "[s]ometimes our cases

phrase the test differently, looking instead for evidence that the workplace was both subjectively and objectively offensive." *Id.* at 900. "In other words, the environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) (citation omitted). Gone are the days when a work environment must be "hellish" to be actionable. Yet still, "[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Johnson* 892 F.3d at 900 (quoting *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012)).

Mr. Hardwick's hostile work environment claim is based upon a single comment he alleged Ms. Brantley made to him. But rather than a legally cognizable hostile work environment, he has described offensive conduct that was isolated, did not interfere with his work performance, and was not physically threatening. This is precisely the type of work environment that the Seventh Circuit has held is not a hostile work environment. *Yancick*, 653 F.3d at 544 (citing *McPhaul v. Bd. of Comm'rs of Madison Cnty.*, 226 F.3d 558, 567 (7th Cir. 2000)) ("We will not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating"). Although the comment Mr. Hardwick relies upon is offensive, "[d]iscrimination laws do not mandate admirable behavior from employers, through their supervisors or other employees." *Johnson*, 892 F.3d at 900 (quoting *Russell v. Bd. of Trs. of Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001)). In short, the evidence, even when viewed in the light most favorable to Mr. Hardwick, is not adequate to support a hostile work environment claim.

Before moving on to Mr. Hardwick's retaliation claim, however, the Court will address one additional argument Mr. Hardwick made in support of his hostile work environment claim. In

bringing his claim, Mr. Hardwick invoked the Me Too Movement. The phrase "Me Too" has its origins in the work of Tarana Burke, who founded the "Me Too" movement in 2006 because she "wanted to do something to help women and girls - particularly women and girls of color - who had [] survived sexual violence." *Meet the woman who coined 'Me Too' 10 years ago – to help women of color*, Chicago Trib., October 19, 2017 at http://www.chicagotribune.com/lifestyles/ct-me-too-campaign-origins-20171019-story.html (last visited September 20, 2018). In early October 2017 #MeToo became an internet phenomenon, a "viral awareness campaign that inspired millions of posts on Facebook and Twitter" after dozens of women spoke out against the sexual misconduct of Harvey Weinstein. *Id.*

Here, Mr. Hardwick invoked the movement in an apparent attempt to argue that it has altered the analysis this Court must make under Title VII. The Court rejects this frivolous argument, as no Court in the country, let alone in this Circuit, has suggested that the #MeToo Movement alters the scope of Title VII.

In addition, Indiana Bell's observation on this point is well taken: "[Mr.] Hardwick's comparison of himself to the individuals who brought the #MeToo movement to the national conversation is insulting to the movement and the women involved." [Filing No. 84 at 2] n.2.] Sexual assault, sexual violence, and sexual abuse are a far cry from the isolated comment that Mr. Hardwick describes. Indeed, the Seventh Circuit's recent statement in *Johnson* is instructive here: "[w]e expect a certain level of maturity and thick skin from employees." *Johnson* 892 F.3d at 900. This, Mr. Hardwick has not demonstrated.

Given that the evidence viewed in the light most favorable to Mr. Hardwick falls short of supporting his hostile work environment claim, Indiana Bell's Motion for Summary Judgment as to Mr. Hardwick's sexual harassment claim based on a hostile work environment is **GRANTED**.

## B. Retaliation

Indiana Bell also argues that Mr. Hardwick's retaliation claim fails "because he did not engage in protected activity and even if he did, he has no evidence from which it could be reasonably inferred that protected activity caused his termination." [Filing No. 69 at 19.] Specifically, Indiana Bell contends that Mr. Hardwick "reporting" the alleged comment "does not meet the statutory requirements for protected activity" because he "simply asked [Charles] Smith if he recalled the conversation– he did not state that he found the comment offensive or object[ed] to it in an way that could be reasonably interpreted as raising a concern about sexual harassment." [Filing No. 69 at 19-20.] In addition, Indiana Bell argues that "no reasonable jury could conclude that protected activity caused [Mr.] Hardwick's discharge" because he has presented "no evidence that [Ms.] Brantley, the decision-maker, or [Ms.] Biehl, who supported the decision, had any knowledge of [his] purported complaints." [Filing No. 69 at 21.] Indiana Bell further contends that there is no inference of a causal connection between any protected activity and Mr. Hardwick's termination because of the time lapse between the two events, the intervening event of the December Audit, and a lack of evidence of disparate treatment. [Filing No. 69 at 21-23.] Lastly, Indiana Bell argues that there is no evidence of pretext in this case because Mr. Hardwick "cannot point to any evidence that casts doubt on the honesty of [Ms.] Brantley's explanation for her decision to terminate [Mr.] Hardwick's employment, let alone evidence that points to his alleged protected activity as the real reason." [Filing No. 69 at 23-24.]

In his response brief, Mr. Hardwick contends that "the facts support that [he] engaged in protected activity" by having a conversation with Mr. Smith in which he stated "that he was considering calling the EEOC regarding the "Nice ass" statement" and that he considered the statement to be sexual harassment. [Filing No. 80 at 19.] In addition, Mr. Hardwick argues that

he is entitled to a "reasonable inference" Ms. Brantley was aware of his complaint because "Ms. Brantley was Mr. Smith's supervisor, his boss" and therefore "[t]his Court and a jury can easily find and believe that Mr. Smith told his immediate supervisor, Ms. Brantley, about Mr. Hardwick's complaints." [Filing No. 80 at 20.] Mr. Hardwick contends that the requisite causal connection is present in this case due to the following:

- the "short timeframe" between the protected activity and his termination;

- the times that Ms. Brantley singled him out, including her assessment that Mr. Hardwick was the biggest offender of all of the technicians in the December Audit and her unwillingness to allow Mr. Toothman to be a part of the termination proceedings;

- the fact that it is unclear "what violations if any" Mr. Hardwick "really had once all of the facts are known" about his activities during the December Audit; and

- the appearance that Ms. Brantley "held onto the Martinsville garage just long enough to fire" him. [Filing No. 80 at 21-22.]

In addition, Mr. Hardwick argues that he has shown disparate treatment by showing that he "was not the only offender in the Martinsville garage" and that Ms. Brantley admitted "that she wanted to make an example out of Mr. Hardwick." [Filing No. 80 at 22-23.] Lastly, Mr. Hardwick argues that Ms. Brantley repeatedly lied and ignored Mr. Hardwick's explanation for his actions during the December Audit. [Filing No. 80 at 23.] Mr. Hardwick alleges that "[o]nly a fool would believe business records in a vacuum," and states that doing so "is the equivalent of convicting someone for murder because the gun that killed the victim was registered to their name even though the evidence establishes that the gun owner was in Europe on vacation at the time of the murder." [Filing No. 80 at 23.]

In its reply brief, Indiana Bell argues that Mr. Hardwick's "purported belief that [Ms.] Brantley's isolated comment constituted sexual harassment is objectively unreasonable, and therefore, his conversation with [Mr.] Smith about that single comment is not protected by statute." [Filing No. 84 at 6-7.] In addition, Indiana Bell contends that Mr. Hardwick "concedes there is no evidence [Ms.] Brantley knew of his alleged complaint to [Mr.] Smith, a concession which is fatal to his retaliation claim." [Filing No. 84 at 8.] Indiana Bell also maintains that it is entitled to summary judgment "because it honestly stated its rationale for terminating [Mr.] Hardwick's employment, and no reasonable jury could doubt that rationale." [Filing No. 84 at 9.] Further, Indiana Bell contends that it "investigated [Mr.] Hardwick's explanations and found them to be discredited by other information in the Company's possession." [Filing No. 84 at 9-10.]

Mr. Hardwick does not address these arguments in his surreply.

"To state a retaliation claim under Title VII, 'the plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two.'" *Emerson v. Dart*, 900 F.3d 469, 472 (7th Cir. 2018) (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).

Turning first to the issue of whether Mr. Hardwick engaged in protected activity, the Seventh Circuit has clarified that "'[p]rotected activity' is 'some step in opposition to a form of discrimination that the statute prohibits.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (quoting *O'Leary*, 657 F.3d at 631). "It's not necessary that the employee opposed a practice that is actually prohibited by Title VII; the employee need only have a good-faith and *reasonable* belief that he is opposing unlawful conduct." *Ferrill*, 860 F.3d at 501 (citations omitted, emphasis in original). In this case, Mr. Hardwick points to his discussion with Mr. Smith in the autumn of 2013 as providing the requisite protected activity. Although it is not

clear that Mr. Hardwick's belief that he was opposing unlawful conduct was reasonable, viewing the facts in the light most favorable to Mr. Hardwick, he asked Mr. Smith if he remembered Ms. Brantley's comments and told Mr. Smith that he considered the comment sexual harassment. Therefore, the Court will assume for the sake of argument that this is enough to qualify as opposition to a form of discrimination prohibited by Title VII.

But Mr. Hardwick's termination counts as retaliation only if Ms. Brantley and Ms. Biehl had "actual knowledge" of Mr. Hardwick's complaint. *Emerson*, 900 F.3d at 472 (citing *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009)). There is, however, no evidence whatsoever that Ms. Brantley or Ms. Biehl had actual knowledge of Mr. Hardwick's protected activity. Mr. Hardwick admits he has no direct evidence to show that Ms. Brantley was aware of his complaint, but cites *Luckie v. Ameritech Corp.*, 389 F.3d 708 for the proposition that he is entitled to a reasonable inference that the decision maker was aware of the complaint. [Filing No. 80 at 20.] But just as the Seventh Circuit in *Luckie* found that "there is simply no evidence in the record that would support such an inference," *id.* at 715, here too, there is no evidence to support such an inference. Ms. Brantley and Ms. Biehl testified that they never had any indication that Mr. Hardwick had ever felt uncomfortable about interactions with Ms. Brantley prior to terminating Mr. Hardwick's employment, [Filing No. 67-2 at 28; Filing No. 67-5 at 4], and there is nothing in the record that refutes either individual's account. Accordingly, Mr. Hardwick is not entitled to an inference that Ms. Brantley or Ms. Biehl had actual knowledge of his complaint. This fact is fatal to Mr. Hardwick's retaliation claim, and the Court's analysis need not go further. However, the Court will briefly address another element of Title VII retaliation.

To establish the required causal connection, a plaintiff "must show that the desire to retaliate was the but-for cause of the challenged employment action." *Robinson*, 894 F.3d at 830

(quotation and citations omitted). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 830 (quoting *University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "[R]etaliatory motive may be established through circumstantial evidence such as suspicious timing, ambiguous statements, evidence that the stated reason for the employment decision is pretextual and other evidence from which an inference of discriminatory intent might be drawn." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016) (citation omitted). "Suspicious timing can sometimes raise an inference of a causal connection, but temporal proximity alone is 'rarely sufficient' to establish causation." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) (quoting *O'Leary*, 657 F.3d at 635).

In this case, the requisite causal connection analysis is greatly impacted by the December Audit, the results of which show Indiana Bell's purported reason for terminating Mr. Hardwick's employment. First, the December Audit severely undermines Mr. Hardwick's suspicious timing argument, as it occurred between his alleged protected activity and the termination of his employment, thus bolstering Indiana Bell's contention that the results of the December Audit led to the termination. In addition, the December Audit renders irrelevant Mr. Hardwick's arguments regarding a meeting in fall 2013, the content of which is in dispute. Regardless of what was discussed at that meeting, the December Audit supports Indiana Bell's reasoning for terminating Mr. Hardwick's employment.

Although Mr. Hardwick has his own explanation for the results of the December Audit, that is not sufficient to show pretext. Here, he repeatedly makes the bold statement that Ms. Brantley and Indiana Bell "knowingly lied" to this Court because they disagreed with his explanations for his actions during this time. [Filing No. 80 at 23.] This is both a serious allegation

and an inaccurate one. Indiana Bell was under no legal obligation to believe Mr. Hardwick's version of events, and indeed, Indiana Bell put forth evidence that Ms. Biehl subsequently researched Mr. Hardwick's explanations and found them unconvincing. Mr. Hardwick's argument on this point fundamentally misses the issue before this Court, which "is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Castro*, 786 F.3d at 565 (citation omitted). Indiana Bell has put forth lengthy evidence of its findings from the December Audit and of Ms. Biehl's subsequent research into Mr. Hardwick's explanations. Mr. Hardwick, meanwhile, has identified nothing implausible, inconsistent, or contradictory in Indiana Bell's reasoning, but only argues that it was inaccurate. This does not show pretext.

In sum, Mr. Hardwick's efforts to shoehorn the evidence in this case into a finding of pretext are unsuccessful. Even if he could prove that he engaged in protected activity, which he cannot, he has failed to show that the desire to retaliate was the but-for cause of his employment termination. Accordingly, Indiana Bell's Motion for Summary Judgment on Mr. Hardwick's retaliation claim is **GRANTED**.

## VI.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Indiana Bell's Motion for Leave to File a Response to Plaintiff's Sur-reply [90]. In addition, the Court makes the following evidentiary rulings:

- Indiana Bell's Motion to Strike paragraph 6 of Mr. Hardwick's affidavit is **DENIED,**

- Mr. Hardwick's Motion to Strike Ms. Biehl's Declaration is **DENIED**, and

- Indiana Bell's motion to strike Paragraphs 8 through 14 of Mr. Hardwick's Surreply is **GRANTED** and Paragraphs 8 through 14 of Mr. Hardwick's Surreply, [89], are **STRICKEN**.

Lastly, the Court **GRANTS** Indiana Bell's Motion for Summary Judgment, [66]. Final judgment shall enter accordingly.

Date: 9/26/2018

*Jane Magnus-Stinson*

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**